E. L. TRENHOLM, TRUSTEE, *v.* MARY R. MILES.

[59 South. 930.]

1. PLEDGES. *Elements. Sales. Definition. Landlord and tenant.*

A "pledge" is a transfer of personal property as a surety for a debt or other obligation. A necessary element to constitute a contract one of pledge, is that the legal title to the pledged property must remain in the pledgor.

2. SALES. *Definition. Debtor. Creditor. Payment.*

Where goods are delivered by a debtor to his creditor in payment of the debt, the transaction has the effect of a sale; and the same is true, if goods are delivered by the debtor to the creditor to be sold, and the proceeds applied on the debt with a return of the surplus.

3. SAME.

A transaction, on its face a sale, will not be converted into a pledge by a mere agreement to resell.

4. PLEDGE. *Sale. Nature of transaction. Landlord and tenant.*

Under the agreed state of facts in this case it was held by the court that the delivery of the rent cotton by the tenant to the landlord was not a pledge, but a payment by the tenant on his debt.

APPEAL from the chancery court of Yazoo county.
HON. G. G. LYELL, Chancellor.
Suit by E. L. Trenholm, trustee, against Mary R.
Miles.

From a decree dismissing the bill, complainant appeals.

The facts are fully stated in the opinion of the court.

*Williams & George* and *E. L. Brown,* for appellant.

*Noel, Boothe & Pepper,* for appellee.

No brief of counsel on either side found in the record.
Argued orally by *E. F. Noell,* for appellee and *W. R.*

*Harper,* for appellant.

REED, J., delivered the opinion of the court.

This is a suit brought by appellant, E. L. Trenholm,
trustee, administering the estate of C. L. King, bankrupt,
against appellee, to recover the sum of sixteen thousand,
eight hundred and eighty-nine dollars and ninety cents,
which he charges she accepted from the bankrupt with
intent to receive a preference, and knowing that he was
insolvent, and an extinguishment of an unsecured indebt-
edness due her by the bankrupt, contracted more than
four months before his bankruptcy, which payment, so
he alleges, enabled her to obtain a greater percentage of
the debt due her than any other of the bankrupt's cred-
itors of the same class. The suit was originally insti-
tuted in the circuit court, and transferred by consent to
the chancery court. From a decree by the chancellor,
dismissing the bill, appellant appeals.

It appears that the appellee, Mrs. Mary R. Miles,
leased to C. L. King two tracts of land, one the Mile-
stone field, for seventy-five thousand pounds of lint cot-
ton, and the other the Good Hope field, for three thou-

sand dollars.  This lease continued during the year, 1908.
C. L. King on January 1, 1908, executed a deed of trust
in favor of appellee on all of his crops raised on said
tracts during 1908 to secure an indebtedness evidenced
by note for the sum of twelve thousand dollars, payable
January 1, 1909.  It is provided in this deed of trust that,
if the trustee should take possession of the crops, he is
authorized to gather, gin, and prepare it for market,
"and thereafter sell it to the best advantage, at private
or public sale, as the case may be, and all expenses of
taking, gathering, ginning, bailing, and selling shall be a
lien upon such corn and cotton, and be paid out of the
proceeds of the sale thereof."

There is an agreed statement of facts in the case, and
it is therein shown that C. L. King delivered to appel-
lee, at her request, all the cotton raised on the leased
premises during the year 1908, and that it was by her
consigned and shipped to her from Milestone to New Or-
leans, Louisiana, and sold by her through her agent in
New Orleans, and the proceeds applied to the account of
rent and supplies due her by King; that after the de-
livery of the cotton at Milestone, King had no further
control of the cotton; that Mrs. Miles directed the rail-
road agent as to the shipment of the cotton, and that
her liens as landlord and under the deed of trust cov-
ered all the cotton raised that year, "whether delivered
in 1908 or 1909, unless as a matter of law said liens
were lost by shipment to New Orleans, Louisiana;" that
it was verbally agreed between Mrs. Miles and King that
the net proceeds of the cotton sold in New Orleans should
be credited to his indebtedness, and that the proceeds
of said cotton were not in excess of the amount owing
to Mrs. Miles; that King had no kind of communication
with the agents in New Orleans relative to the disposi-
tion of the cotton, "and that no written agreement rela-
tive to the shipment or application of payments, was
made between the said King and Mrs. Miles, except the

deed of trust, recorded as aforesaid which deed of trust is herewith filed and made a part of this agreement and lease contract, filed and made a part thereof.'' The agreed statement also contains the following: ''It is further admitted that no part of said cotton was ever sold to the said Mrs. Miles by the said King, and that no agreement relative thereto and not herein stated existed between the said King and the said Mrs. Miles; but said cotton was delivered by King at Milestone, Holmes county, Miss., to the said Mrs. Miles, for the reason that she had liens as landlord under lease contract, and as *cestui que trust,* under the deed of trust heretofore referred to, each of which liens had been in existence prior and since January 1, 1908.'' C. L. King filed his petition for adjudication as a bankrupt on March 24, 1909.

There is nothing unusual about the transaction between C. L. King and appellee. It is an ordinary business affair, quite common in this state in the dealings between planters and tenants. It is contended by appellant that the understanding between appellee and C. L. King that she should sell the cotton in New Orleans and apply the proceeds thereof to the settlement of the amount due for rent and supplies amounted to a pledge, and that the pledge was substituted for the liens held by appellee as landlord and under her deed of trust, and that such pledge was not recognized under the laws of Louisiana, and that, therefore, appellee lost all liens which she had on the cotton when it crossed the state line from Mississippi into Louisiana.

What is a pledge? We find the following definition in 31 Cyc. 785: ''A pledge is a transfer of personal property as a security for a debt or other obligation.'' And from the same volume we get the following other definitions: ''A deposit of goods, redeemable on certain terms.'' 4 Kent's Comm. 138. ''A lien created by the owner of personal property by the mere delivery of it to

another, upon an express or implied understanding that it shall be retained as security for an existing or future debt." 3 Parsons, Contracts, 271. In 31 Cyc. 787, it is stated, as an element necessary to constitute a contract one of pledge, that the legal title to the pledged property must remain in the pledgor. In Jones on Pledges, p. 1, the following definition is given: "A pledge may be defined to be a deposit of personal property as security with an implied power of sale upon default."

Under the head of "Sale Distinguished from Other Transaction," in 35 Cyc. 33, is the following: "A sale is to be distinguished from a pledge, which is a bailment to secure the payment of a debt or the performance of some other act; the pledgee acquiring only a special property in the thing pledged. When personal property is delivered as security, the transaction is a pledge. But if goods are delivered by a debtor to his creditor in payment of the debt, the transaction has the effect of a sale; and the same is true if goods are delivered by the debtor to the creditor to be sold, and the proceeds applied on the debt, with a return of the surplus. A transaction on its face a sale will not be converted into a pledge by a mere agreement to resell." In the case of *Foster* v. *Magill,* 119 Ill. 75, 8 N. E. 771, it was held that where a creditor purchased from his debtor certain personal property, subject to the mortgage thereon, and assumed the mortgage debt, and agreed upon a sale of the property to give the debtor credit for the entire proceeds of the sale, less the mortgage debt, and possession was taken, the title, if so intended, would thereby pass, although the definite amount for which credit was to be given had not been determined. In deciding that this did not constitute a pledge, the court said: "Nothing was left for the vendor to do to complete the sale, but it seems to have been the intention of both parties that the title to the property should then pass. The fact that the definite amount which De Land

should ultimately receive was not then fully determined did not change the character of the transaction." The distinction between a bailment and a sale is laid down in the case of *Mallory* v. *Willis*, 4 N. Y. 85, as follows: "When the identical thing delivered, although in an altered form, is to be restored, the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the specific article, and the receiver is at liberty to return another thing of equal value, he becomes a debtor to make the return, and the title to the property is changed, it is a sale."

It will be noted in the present case that the appellee had all the liens and security she could ask for on the cotton, and that this was recognized by C. L. King. Under the definition that a pledge is a transfer of the personal property as security, is there any reason to decide that King transferred to Mrs. Miles the cotton as security? We conclude that the facts agreed upon, which include the provisions of the lease contract and the deed of trust, show that the cotton was not delivered as security. Is it not clear that the cotton was delivered to appellee, the holder of the liens, at Milestone, in Mississippi, in payment and satisfaction of the amounts due her and secured by the liens she held?

Another requisite in a pledge is the right to redeem the property deposited. Did King have any such right in this case? Surely the statement of facts shows that he did not. The cotton was delivered to appellee, who had the right to receive it. It was absolutely and forever out of the possession of King, with no right of redemption on his part. Still another requisite to a pledge is that the legal title to the pledged property must remain in the pledgor. It is clear in this case that no legal title remained in King. The agreed statement of facts expressly states that after the delivery of the cotton at Milestone King had no further control of the same. The cotton was not only delivered to Mrs. Miles, but shipped

by her to herself in New Orleans, and there sold by her through her agents. If the property had been lost in transit, it would have been necessary for her to bring the suit for recovery against the carrier.

From the statement of facts it is clear to us that the cotton was delivered by King to appellee pursuant to the terms of his deed of trust, and in accordance with the requirements of her landlord's lien, and that then and there there was a settlement between the parties, and that the shipment and sale of the cotton out of the state was a matter of detail after such settlement, in order to reduce the cotton to cash, so that the net amount might be properly applied to the indebtedness due by the tenant. It will be seen that in his deed of trust King authorizes that this should be done, and that the expenses thereof should be taken out of the proceeds. The case of *Harris* v. *Lombard,* 60 Miss. 29, is cited to sustain appellant's contention. It will be noticed that COOPER, J., in delivering the opinion of the court, said: "There is nothing in the evidence in this case proving or tending to prove that Mrs. Lombard, the claimant, was a purchaser of the property attached. . . . If Mrs. Lombard had purchased the goods in good faith from Boyd, relinquishing, in whole or in part, her debt against him as the consideration of the purchase, her title would have been valid."

A comparison of the cases will show that that case is very different from and will not control the instant case. When Mr. King delivered the cotton to appellee at Milestone, everything necessary was done to close the transaction of the payment of the value thereof on the rent and amount due under the deed of trust. In fact, there was a delivery of the property by the debtor to the creditor in the payment of the debt, and in this case no necessary element of a sale was lacking. There was nothing to be returned to Mr. King, and as stated above, and as shown in the agreed statement of facts, the proceeds

of said cotton were not in excess of the amount owing to Mrs. Miles. The title to the incumbered property was complete in the creditor, who had possession of the same, with a right to its custody and disposition, and with only the liability to apply properly the net proceeds.

In the case of *Peets & Norman Co.* v. *Baker,* 95 Miss. 580, 48 South. 899, it is decided that a party purchasing agricultural products subject to lien for rent is liable to the landlord for the value of such products in the amount of rent, although the products were at once shipped by the creditor for the tenant out of the state, to be there sold, and credit was not to be given the tenant for their value until the proceeds of the sale in another state were received by the creditor. MAYES, J., in delivering the opinion in that case, said: "The uncontradicted testimony shows that Packer delivered the tomatoes to Norman to be placed on his account, and they were received with this understanding. The only thing remaining to be done by Norman was to ship them to the market and make the actual credit on the books, when the returns came back showing the amount of the proceeds. The tomatoes were taken to Norman, with the intent to be applied to the account. They were received by Norman for this purpose, and shipped out of the state for the purpose of converting them into money, intending, at the time when the proceeds should come in, that they should be applied as a payment of Packer's debt. If these facts do not make Peets & Norman Company liable for a conversion of these tomatoes, the lien attempted to be given to landlords under section 2832 of the Code of 1906 is mythical."

We cannot see that the chancellor erred in dismissing the bill in this case.

*Affirmed.*